**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

MARK DOYLE CONSTRUCTION, LLC,       CIVIL ACTION NO. 17-0674
ET AL.

VERSUS                                JUDGE S. MAURICE HICKS, JR.

TRIHM FOUNDATION, LLC, ET AL.       MAGISTRATE JUDGE HORNSBY

**MEMORANDUM OPINION**

This matter came on for bench trial on September 23, 2019. <u>See</u> Record

Document 145. Post-trial memoranda were also filed. <u>See</u> Record Documents 149-151.

The remaining Plaintiff in this matter is Mark Doyle Construction, LLC ("MDC"). The

remaining Defendants are David Harris ("Harris") and First Standard Asurety, LLLP

("FSA").[1] The Court has diversity of citizenship subject matter jurisdiction over this matter

pursuant to Title 28, United States Code, Section 1332. Based on the factual findings

and legal conclusions set forth below, the Court renders judgment in favor of MDC and

against Defendants in the amount of $33,000.

<u>FINDINGS OF FACT</u>

MDC is a limited liability company that is organized under the laws of the State of

Louisiana. The two members of the company are Mark Doyle and Sharon Doyle. Mark

Doyle is the president of MDC.

FSA is a limited liability limited partnership registered in the State of Georgia.

Harris is the sole partner of FSA.[2] Former Defendants in this action include TriHM

---

[1] TriHM Foundation, LLC and Dr. Jacqueline D. Cooper were voluntarily dismissed as
Defendants on December 16, 2016. <u>See</u> Record Document 20.
[2] The validity of FSA as a limited liability limited partnership under Georgia law will be
discussed *infra* in the context of the individual liability of Harris.

Foundation, LLC ("TriHM") and Dr. Jackqueline D. Cooper ("Cooper"). Cooper was TriHM's sole manager.

FSA and Harris run and maintain a bonding/surety company, of which MDC was a client. Mark Doyle and Sharon Doyle knew Harris through business dealings dating back to 2012 or 2013. Specifically, the Doyles' relationship with Harris related to obtaining necessary bonds for their construction business. Mark Doyle testified at trial that Harris was the exclusive bond provider for his construction business. He believed Harris had provided approximately ten bonds for MDC. The Doyles always paid Harris directly for bonds in relation to their construction projects. In 2014, Harris first mentioned Cooper to the Doyles. While Harris and Cooper had met in person, the Doyles only spoke to Cooper over the telephone and never met her in person.

In or around November 2013, FSA and Harris accepted the terms of an agreement whereby Cooper and/or TriHM would pay Harris $400,000 in return for helping Cooper obtain investors. See Plaintiff's Exhibit 3 at Doyle 0023. Around this same time, Harris met with Cooper in Texas to discuss procuring an A-Listed surety, and combining their contacts to obtain assets for investment in TriHM. Harris never received any compensation under this agreement.

On February 6, 2014, at approximately 9:12 p.m., Mark Doyle received a telephone call from Harris wherein Harris asked Mark Doyle if he was interested in investing in a mega-million-dollar project that one of his clients, Cooper, was steering. The project related to a Texas foundation and, more specifically, the opening of a children's hospital in San Antonio, Texas. See Plaintiff's Exhibit 5 (TriHM Project Proposals). Sharon Doyle and Vernon Thomas ("Thomas"), a close friend of the Doyles and an MDC employee,

were listening to this call via speaker phone. The Doyles did not know Cooper. At first, the Doyles were skeptical of the risk and declined the investment offer. There was further discussion and Harris informed the Doyles that if they could make an initial investment of $30,000, then he would bond the investment. According to Mark Doyle, Harris told them Cooper was "good for it" and the Doyles could collect about $300,000 within 14 days. Mark Doyle testified that he told his wife "we can't lose" since Harris would bond the money and "we have to try this." The call between the Doyles and Harris ended.

On February 6, 2014, Harris followed up the Mark Doyle phone call with a 9:53 p.m. email to Cooper stating:

I believe I have procured for you a final investor for the last $30k you need to close your loan, since your attorneys agreed to lend $68k of the last $98k, for a return of $3 million on the $68k part. You are aware that as a bondsman, I do not usually get involved in financially assisting clients with investments, especially with other clients, however, yours is a good cause and seemingly very plentiful one to share as well. I would like to ask if the following terms could also be achieved in return for this investor's involvement, assuming he agrees:

1. Mark's return will be agreed to be $300k at loan close in return for his $30k investment.

2. He will be able to see any/all documents he wishes, and talk to closing attorneys if he wishes on Friday 2/7/14.

3. Loan Closing will be assured and loan monies distributed in full no later than February 13, 2014.

4. A fee of $1 million to be paid to me, [i]n addition to the $400k promised as bonus thus far for the extended bonding, totaling $1.4 million paid to me and/or my assigns at close via my bank wire I have provided you.

5. Full confidentiality of all business matters between you and me, so no one else knows our business.

6. You will also agree to help yourself and me together purchase a US Treasury Listed Surety so we can continue to generat[e] large profits to help

other minority and small businesses compete on bids against advantageous competing large contractors.

Plaintiff's Exhibit 3 at Doyle 0023-0024. The Doyles both testified that they had no knowledge during this time period that Harris was to get paid for facilitating their investment with Cooper. They did not learn of the arrangement between Cooper and Harris until sometime in November 2014.

At approximately 10:03 p.m. on February 6, 2014, ten minutes after sending the email, Harris again called Mark Doyle. This call was a conference call with Cooper. Sharon Doyle was also on this phone call. According to Mark Doyle, Cooper explained the investment opportunity and the Doyles agreed to the $30,000 investment. Mark Doyle testified that over the next few days he spoke with Cooper directly, as he had her phone number by this time, and she again told him to send the investment and the bond premium directly to her. Mark Doyle stated that he confirmed this with Harris who instructed him to send all the money – the $30,000 investment and the $3,000 bond premium – to Cooper's trust account. The Doyles then wired $33,000 to Cooper's trust account and expected a $300,000 return within 14 days.

At the bench trial, the Doyles produced a Financial Guarantee Indemnity Bond that Harris emailed to them. See Plaintiff's Exhibit 1 at Doyle 0033-0043. This bond related to the Doyles' first $30,000 investment. The bond was issued on and had an effective date of February 10, 2014. The beneficiary was MDC and the surety company was FSA. The Doyles testified that there was nothing in this bond, such as a watermark or a shadow mark, indicating that it was just a sample or draft of a preliminary bond to be issued. Harris testified that the bond was a draft, not a bond. He also referred to the bond as a "binder." The bond did contain the following language:

> Said premium must be paid in full via bank wire transfer before 5 PM on February 11, 2014 in order to keep the instrument active and valid for the duration as documented herein. It is the responsibility of each party herein to track said timely fee payment with FSA to assure the FG remains active and valid.

Id. at Doyle 0034. The bond was signed by Harris and a seal was affixed. See id. at Doyle 0042-0043.

There was never an email sent to the Doyles stating that the bond premium had been paid. In fact, Mark Doyle testified at bench trial that he called Harris after the 5 PM deadline either on February 11 or February 12, 2014 "to ask him did he get his money." Harris informed Mark Doyle that he had not received the bond premium money, but do not worry because Cooper was good for it. When asked by the Court if he understood that if no premium was paid, then there was no bond in place, Mark Doyle answered, "Yes, I understand that." Mark Doyle further testified that he called Harris two or three times because he was concerned and wanted to make sure Harris got the bond premium money. He made these calls because he understood the significance of the bond being no good if Harris did not get paid. According to Mark Doyle, Harris repeatedly told him not to worry because Cooper is good for it. Mark Doyle admitted that he knew as of February 12, 2014 that there was no bond in place. Conversely, Sharon Doyle testified that Harris led them to believe they were still bonded.

After 14 days had passed, Mark Doyle testified that Cooper needed more investment money. He was not financially sound at the time to come up with all of the investment money she desired so he reached out to three friends -- Woodrow Wilson

("Wilson"), Johnny Smith ("Smith"), and Caldwell Dunn ("Dunn").[3]     Mark Doyle represented to these friends that their investment would be bonded by Harris and stated he pulled these investors in because of his personal relationship with and reliance upon Harris.  While Mark Doyle knew that the February 11, 2014 bond was not in place due to nonpayment of the premium, he did not tell Wilson, Smith, or Dunn that the previous bond premium had never been paid.   At bench trial, MDC produced four additional bonds relating to the second round of investments.  See Plaintiff's Exhibit 3 at Doyle 0044-0085. Again, these bonds were emailed to the Doyles and Harris maintains they are drafts, not bonds.

The first bond relating to the second round of investments was issued to MDC as the beneficiary.  See id. at Doyle 0044.  The bond was issued and had an effective date of March 7, 2014.  See id.  The bond covered a $48,000 investment and there was a $4,800 premium.  See id. at Doyle 0045.  The second bond was issued to Smith as the beneficiary.  See id. at Doyle 0055.  The bond was issued and had an effective date of March 17, 2014.  See id.  The bond covered a $25,000 investment and there was a $2,500 premium.  See id. at Doyle 0056.  The third bond was issued to Dunn as the beneficiary.

---

[3] Wilson, Smith, and Dunn assigned all their rights to MDC through the execution of affidavits that stated:

> For valuable consideration, I assign and transfer to Mark Doyle Construction, LLC, any and all past, present, or future claims, whether known or unknown, and whether based on tort, contract, or other theory of recovery, that have accrued or that may accrue later, or otherwise be acquired on account of, or in any way grow out of, or that are the subject of the Lawsuit, and (b) any and all judgments and recoveries whatsoever arising from or related to the lawsuit.

Record Documents 44-46.

See id. at Doyle 0065. The bond was issued and had an effective date of March 13, 2014. See id. The bond covered a $10,000 investment and there was a $1,000 premium. See id. at Doyle 0066. The final bond was issued to Wilson as the beneficiary. See id. at Doyle 0075. The bond was issued and had an effective date of March 13, 2014. See id. The bond covered a $20,000 investment and there was a $2,000 bond premium. See id. at Doyle 0076. All of these bonds were signed by Harris and a seal was affixed. See id. at Doyle 0053, 0054, 0064, 0074, 0084. All of the bonds contained language requiring the premium to be paid in full via wire transfer before 5 PM within one to three days in order to keep the instrument active and valid. See id. at Doyle 0045, 0056, 0076.[4] Once again, the investment money and bond premiums for this second round of investments were wired directly to Cooper. Over the course of the two rounds of investments, a total of $146,300 was wired from MDC to Cooper -- $133,000 in investment money and $13,300 in bond premiums. Additionally, the Doyles made two loans to Cooper in the amount of $9,000 and $5,830. These loans were purportedly for the foundation's payroll and office expenses. Mark Doyle testified that Cooper assured him he would get this money back. It does not appear that Harris had any knowledge of these loans. The total amount of money wired to Cooper was $161,130.

Mark Doyle testified at bench trial that he would agree that a prudent investor should do some cursory investigation for investment transactions such as the ones at issue in this case. Yet, he did not perform due diligence in this instance because of the

---

[4] The Dunn bond was issued and effective on March 13, 2014. See Plaintiff's Exhibit 1 at Doyle 0065. However, the payment provision stated, "said premium must be paid in full via bank transfer before 5 PM on March 10, 2014 in order to keep the instrument active and valid for the duration as documented herein." Id. at Doyle 0066.

existence of the financial guarantee bonds, that is, because his principle investment was guaranteed because of the bonds. Mark Doyle admitted he did not run a background check on Cooper; he did not ask his accountants to perform any type of background check or due diligence on Cooper; he did not ask for a personal financial statement from Cooper; and he never asked Harris, "How do you know Cooper is good for it?" Sharon Doyle testified similarly, stating there were no background checks on Cooper. According to Sharon Doyle, they relied on Harris's word.

Certain aspects of the February 6, 2014 phone calls are in dispute. For instance, Mark Doyle repeatedly testified that Harris told him at that time to send the $30,000 investment and the $3,000 bond payment direct to Cooper. Mark Doyle's testimony regarding the bond payment was corroborated by Sharon Doyle and Thomas. Conversely, at the bench trial, Harris testified that he never directed the Doyles or Thomas to pay the bond premiums to Cooper and not FSA. Specifically, Harris stated that he would never do that; never had done that in the history of his business which he started in January 2012; and never had told anybody to send his business money to somebody else. Harris testified that the Doyles knew how to pay him and they never ordered a final bond so he never invoiced them. However, when questioned by the Court, Harris admitted that it was not normal practice for him to affix his signature and seal to a draft bond.

Harris also testified that during the February 6, 2014 phone calls, he told the Doyles to conduct their own due diligence regarding the Cooper investment and that he "would not vouch for anybody." Harris also maintained that he had no way of knowing if the Doyles actually made the investment with Cooper, as there was no agency relationship

between himself and Cooper. He testified that around the end of March, Mark Doyle called him and stated he had sent money to Cooper and she had not paid on the investments as promised. Cooper was long overdue and she kept delaying payment on the investments. According to Harris, Mark Doyle asked for help in getting his money back from Cooper. Harris stated this was the first time he learned the Doyles had paid Cooper directly for the bond premiums. Mark Doyle disputes this contention, as he said he called Harris on February 12, 2014 and informed him that MDC had made the first investment by sending $33,000 to Cooper. Mark Doyle recalled asking Harris if FSA had received the bond premium payment for this investment. Towards the end of March 2014, Harris began writing letters and emails to Cooper asking her to honor her promises to the Doyles. Harris further testified that he never saw any agreement between the Doyles and Cooper and neither he nor FSA ever got paid the bond premiums.

On November 7, 2014, Mark Doyle demanded payment from FSA/Harris for his $30,000 bonded investment and his $48,000 bonded investment. See Plaintiff's Exhibit 6 at Doyle 0092-0093. He made demand on FSA for the full amount of the bond, as TriHM had not fulfilled its obligations. See id. Wilson also made a similar demand for his $20,000 investment. On November 12, 2014, J. Hatcher Graham, FSA's attorney, responded to both Mark Doyle and Wilson. See Plaintiff's Exhibit 7 at Doyle 0150-0151. The letter provided:

> . . . Ms. Cooper never paid for the bonds, therefore, they were never in effect. Apparently Ms. Cooper promised you, and others, that she would pay for the bonds herself, either from the loan proceeds or through her funds. However, payment for the bonds were never made.
>
> . . .

. . . In most of the cases where she, or Tri HM, promised to make the payment for the surety bond on behalf of the investors, the payments were not made and the bond was not issued. The investors thought they were protected in their investment when, in reality, they were not.

Therefore, unless you can produce more evidence of a completed purchase of the surety bonds, I have been instructed by my client to inform you that they must decline payment on your claim.

Id. MDC now seeks damages in the amount of $161,130.

## CONCLUSIONS OF LAW

In a diversity case such as the matter before this Court, state substantive law applies. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817 (1938); Ashland Chem. Inc. v. Barco Inc., 123 F.3d 261, 265 (5th Cir.1997). The parties agree that Louisiana's substantive law controls.

"To determine Louisiana law, [the Court looks] to the final decisions of the Louisiana Supreme Court." Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co., 352 F.3d 254, 260 (5th Cir.2003). In the absence of a final decision by the Louisiana Supreme Court, federal courts must make an Erie guess and determine, in their best judgment, how that court would resolve the issue if presented with the same case. See id. In making an Erie guess, federal courts are to employ Louisiana's civilian methodology, examining primary sources of law such as the Louisiana Constitution, codes, and statutes. See id. Jurisprudence is a secondary law source in Louisiana. See Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co., 179 F.3d 169 (5th Cir. 1999); see also Am. Int'l Specialty Lines Ins. Co., 352 F.3d at 261. Federal courts are not to disregard the decisions of Louisiana's intermediate courts unless they are convinced that the Louisiana Supreme Court would decide otherwise; however, federal courts are not strictly bound by the decisions of Louisiana's intermediate courts. See Am. Int'l Specialty Lines Ins. Co., 352 F.3d at 261.

In civil matters, the same burden of proof applies regardless of whether the case is tried to a judge or a jury.  See Hampton Bermuda Ltd. v. M/V STAR SIRANGER, No. H-05-3074, 2008 WL 1808550, at *4 (S.D. Tex. Apr. 18, 2008).  Civil cases are typically decided by a preponderance of the evidence.  See Herman & MacLean v. Huddleston, 459 U.S. 375, 387, 103 S.Ct. 683, 690 (1983).  "To establish by a preponderance of the evidence means to prove something is more likely so than not so."  Fifth Circuit Pattern Jury Instructions: Civil, § 3.2 at 30 (West 2020); see U.S. v. Rhodes, 386 F.Supp.2d 726, 740 n.6 (N.D. Tex. 2005) ("Preponderance of the evidence is generally defined as the greater weight and degree of credible evidence and the amount of evidence that persuades [the fact-finder] that a claim is more likely so than not so.") (internal quotation marks omitted).  Thus, MDC bears the burden of satisfying the finder of fact that it has proven every element of its claims by a preponderance of the evidence.

"In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law." Sandoval v. Hagan, 7 F.Supp.2d 1234, 1245 (M.D. Ala. 1998), aff'd, 197 F.3d 484 (11th Cir. 1999), rev'd on other grounds, 532 U.S. 275 (2001) (citing Childrey v. Bennett, 997 F.2d 830, 834 (11th Cir. 1993)); accord Becker v. Tidewater, Inc., 405 F.3d 257, 260 (5th Cir. 2005) (recognizing that the judge is the fact-finder in a non-jury trial).

Here, MDC has alleged two causes of action under Louisiana law:  (1) fraud, more specifically, fraudulent misrepresentation; and (2) civil conspiracy with the underlying tort of fraud/fraudulent misrepresentation.  As to the fraud claim, MDC alleges that Harris represented that any money MDC invested with TriHM/Cooper would be insured with a

bond.  MDC claims this misrepresentation was material because but for such guarantees, the Doyles would not have invested with TriHM/Cooper.  MDC alleges that all of Harris' representations to the Doyles were false promises.  Additionally, MDC contends that Harris and TriHM/Cooper entered into a civil conspiracy "to use unlawful means to accomplish an unlawful purpose to [MDC's] detriment."  Record Document 65 at ¶ 20.

Fraud/Fraudulent Misrepresentation

Here, MDC has alleged a claim for fraud or, more specifically, fraudulent misrepresentation.[5]  Louisiana recognizes a cause of action for intentional fraudulent misrepresentation as to present or past facts.  See Water Craft Mgmt., L.L.C. v. Mercury Marine, 361 F.Supp.2d 518, 562 (M.D.La. 2004), aff'd Water Craft Mgmt. LLC v. Mercury Marine, 457 F.3d 484 (5th Cir. 2006).  This cause of action may be brought either as a breach of contract or tort action.  See id.  Here, MDC has brought its action in tort.  This allows MDC to "recover non-pecuniary losses as well, but only if [it] proves such losses by a preponderance of the evidence."  Id.

The Louisiana Civil Code defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."  La. C.C. Art. 1952.  The article further states that "fraud may also result from silence or inaction."  Id.  "Fraud need only be

---

[5]  At times, it appears that Defendants believe MDC is pursuing a negligent misrepresentation claim.  However, a review of the First Amended Complaint (Record Document 65), the Revised Pretrial Order (Record Document 13), the Proposed Findings of Fact and Conclusions of Law submitted by MDC to the Court prior to the bench trial, and MDC's post-trial briefs establishes that only a fraudulent misrepresentation claim – grounded in the intentional tort of fraud – is being alleged by MDC.

proved by a preponderance of the evidence and may be established by circumstantial evidence." La. C.C. Art. 1957.

"Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill." La. C.C. Art. 1954. Yet, "this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." Id. "The commercial sophistication of the parties is considered by the Court when determining if a party could have ascertained the truth without difficulty, inconvenience, or special skill." Water Craft Mgmt., L.L.C., 361 F.Supp.2d at 562.

The Fifth Circuit has set forth the following elements to sustain a claim for fraud under Louisiana law: (1) a misrepresentation of material fact; (2) made with the intent to deceive; and (3) causing justifiable reliance with resultant injury. See id. at 562–563. While a fraud claim based on unfulfilled promises or statements as to future events will not satisfy the justifiable reliance requirement, a claim of fraud may be predicated on promises made with the intention not to perform at the time the promise is made. See id. at 563. Courts must consider whether a defendant "simply made unfulfilled promises, or whether [he] never intended to honor the alleged misrepresentations [he] made to plaintiffs." Id. In this case, to prove its claim for fraudulent misrepresentation against Defendants, MDC must prove that (1) Defendants made misrepresentations of material fact to MDC during their business relationship; (2) such representations were made by Defendants with the intent to deceive MDC; and (3) MDC justifiably relied on these misrepresentations and such reliance caused it injury.

For claims of fraud by silence or omission, there first must be a duty to speak. <u>See</u> <u>Greene v. Gulf Coast Bank</u>, 593 So.2d 630, 632 (La. 1992). Louisiana law "recognizes that the refusal to speak, in the face of an obligation to do so, is not merely unfair, but is fraudulent." <u>Lomont v. Myer-Bennett</u>, 172 So.3d 620, 629 (La. 06/30/15). "Although a party may keep absolute silence and violate no rule of law or equity, . . . if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to [disclose] the whole truth." <u>Kadlec Med. Ctr. v. Lakeview Anesthesia</u> <u>Assocs.</u>, 527 F.3d 412, 419 (5th Cir. 2008) quoting <u>American Guaranty Co. v. Sunset</u> <u>Realty & Planting Co.</u>, 208 La. 772, 23 So.2d 409, 455-56 (1944). Moreover, before a duty to disclose is imposed, the defendant must have had a pecuniary interest in the transaction. <u>See</u> <u>Kadlec Med. Ctr.</u>, 527 F.3d at 420, citing <u>Barrie v. V.P. Exterminators,</u> <u>Inc.</u>, 625 So.2d 1007, 1017 (La. 1993).

Again, MDC has alleged that Harris represented that any money MDC invested with TriHM/Cooper would be insured with a bond and that such representations to the Doyles were false promises. When considering the fraudulent misrepresentation claim, the Court believes it necessary to group the transactions into three categories: (1) the initial investment made by the Doyles in the amount of $30,000 plus a $3,000 bond premium; (2) the second round of investments by the Doyles, Wilson, Smith, and Dunn in the amount of $103,000 plus $10,300 in bond premiums; and (3) $14,830 in loans.

The Court holds that MDC has met its burden in establishing a fraudulent misrepresentation claim against Harris and FSA as to the first round of investments in the

amount of $30,000 plus a $3,000 bond premium.[6]   Again, under Louisiana law, fraud is

a misrepresentation or a suppression of the truth made with the intention either to obtain

an unjust advantage for one party or to cause a loss or inconvenience to the other.  See

La. C.C. Art. 1952.  The article further states that "fraud may also result from silence or

inaction."  Here, there is no dispute that Harris failed to tell the Doyles of his pecuniary

relationship with Cooper, as there was an agreement for him to be financially rewarded

for securing investors such as the Doyles.  The evidence presented at the bench trial also

_____

[6] It was stipulated in the Revised Pretrial Order that FSA is a limited liability limited partnership under Georgia law and that Harris is the sole partner of FSA.  See Record Document 132 at ¶ B.  More specifically, Harris has asserted that he is both a general partner and a limited partner of FSA.

MDC now argues in post-trial briefing that FSA is not a valid limited liability partnership under Georgia law because "Georgia has adopted the Uniform Partnership Act and the Uniform Limited Partnership Act," both of which require a partnership to have two or more persons.  See Record Document 149 at 8 n. 32; see also Ga. Code Ann. § 14-9-101 ("Limited partnership . . . mean[s] a partnership formed in accordance with Code Section 14-9-201 by two or more persons under the laws of this state and having one or more general partners and one or more limited partners.").  A "person" is defined as "an individual, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity, or any person acting in a representative capacity."  Ga. Code Ann. § 14-9-101(12).  Because Harris is only one person, MDC contends that FSA is not a valid limited liability partnership under Georgia law.  Thus, "if FSA is not a valid limited liability partnership under Georgia law, then Harris has no limitation of liability," "he was acting as an individual[,] and bears liability as an individual."  Record Document 149 at 8.

The Court believes it need not resolve the issue of whether FSA is a valid limited liability partnership under Georgia law, as the end result as to the personal liability of Harris is the same.  If FSA is not a valid limited liability partnership under Georgia law, then Harris is individually liable.  If FSA is a valid limited liability partnership under Georgia law, then Harris is only individually liable if the Court finds he committed "errors, omissions, negligence, malpractice, wrongful acts, incompetence, or misconduct."  Id. at 9; see also Ga. Code Ann. § 14-8-15-(b) & (c).  Here, at least as to the first investment by the Doyles/MCD, the Court has held that Harris committed fraud, thus falling into the category of an an error, wrongful act, and/or misconduct under Section 14-8-15(c).  Thus, Harris is personally liable regardless of FSA's status as a limited liability partnership under Georgia law.

shows a longstanding relationship of confidence between the Doyles and Harris. It was clear from the testimony of Mark and Sharon Doyle that they trusted Harris. Harris had been their exclusive bond provider for their construction business and they valued and trusted their relationship with him. While Harris testified he did not vouch for Cooper, there is certainly no dispute that he introduced the Doyles to Cooper and facilitated the investment transaction at issue. Moreover, the Court found the Doyles' testimony that Harris repeatedly told them Cooper was "good for it" to be credible. Though the Doyles had previous experience in bonding for their construction business, they had little sophistication in the realm of investments such as those presented by Cooper. The Court further notes that Harris went against his usual practices in this case, that is, he affixed his signature and seal to what he alleged to be a draft or binder bond.

All of these facts and circumstances establish by a preponderance of the evidence that Harris intended, at a minimum, to obtain an unjust advantage for himself based upon the continuing relationship between the Doyles and Cooper. Harris's silence as to his pecuniary arrangement with Cooper, his affixing his signature and seal to the draft/binder bond, and his repeated advisements that Cooper was "good for it" amounted to material misrepresentations made with the intent to deceive or gain an unjust advantage. MDC – the Doyles – justifiably relied upon Harris's statements and his silence as to his pecuniary relationship with Cooper, thereby resulting in them losing their $30,000 investment and $3,000 bond premium.

As to the second round of investments, this Court holds that MDC has not met its burden to show justifiable reliance. In fact, the evidence at the bench trial showed reliance upon the representations of Harris and/or Cooper at this point was not justified. While

there was a prior relationship of trust and confidence between the Doyles and Harris, the testimony at the bench trial showed that Mark Doyle knew at the time of the second round of investments that a prudent investor should have done some type due diligence or investigation as to the validity of the investment.  Mark Doyle further testified that he knew at the time of the second round of investments that his original February 11, 2014 bond was not in place due to nonpayment of the premium.  Yet, he did not tell Wilson, Smith, or Dunn that the previous bond premium had never been paid by Cooper to Harris.  Presented with these facts and circumstances, this Court cannot say that any reliance upon the representations of Harris in the context of the second round of investments was justified.  MDC's fraud claim seeking recovery of $103,000 plus $10,300 in bond premiums for the second round of investments must fail.

Finally, MDC seeks to recover $14,830 in loans the Doyles made to Cooper to cover the foundation's payroll and office expenses.  There was very little testimony at the bench trial regarding the loans.  Thus, this Court cannot hold that Harris made any representations in relation to these loans and MDC's fraud claim seeking recovery of the loan amounts also fails.

Civil Conspiracy – Underlying Tort of Fraud/Fraudulent Misrepresentation

An independent cause of action for civil conspiracy does not exist in Louisiana.  See Able Sec. and Patrol, LLC v. State of La., 569 F.Supp.2d 617, 636 (E.D. La. 2008).  "The actionable element of Article 2324 is the intentional tort that the conspirators agreed to commit and committed, in whole or in part, causing plaintiff's injury."  Id.  Article 2324(A) provides:

He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.

Such a conspiracy may be proven by circumstantial evidence. See Hall v. Lilly, 29624 (La. App.2d Cir. 06/18/97), 697 So.2d 676, 679. Nevertheless, the plaintiff must prove that an agreement existed to commit an illegal or tortious act which resulted in the plaintiff's injury. See id. Louisiana courts require "that the agreement between the actors involved in a conspiracy must be an agreement as to the intended outcome or result of their acts." Walker v. Am. Honda Motor Co., 640 So. 2d 794, 797 (La. Ct. App.), writ denied, 94-1741 (La. 10/7/94), 644 So. 2d 644.

As stated previously, "Article 2324 does not by itself impose liability for a civil conspiracy. The actionable element in a claim under this Article is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part." Ross v. Conoco, Inc., 2002-0299 (La. 10/15/02), 828 So. 2d 546, 552. The purpose of solidary liability under Article 2324(A) is to compel any tortfeasor to pay an entire judgment. See id.

Here, MDC seeks to hold Harris solidarily liable with TriHM/Cooper. To recover under a theory of civil conspiracy, MDC must have shown at the bench trial that an agreement existed among Harris and Cooper to commit the tortious act, i.e., fraud, which caused MDC's injury. See Thames v. Thames, 50,639 (La. App. 2 Cir. 5/18/16), 196 So. 3d 653, 656. More importantly, MDC must also "establish that there was an agreement as to the intended outcome or result." See id. At the bench trial, MDC produced circumstantial evidence that there was some type of financial agreement between Harris and Cooper whereby Harris was to help secure investors for Cooper. Such an agreement

was evidenced through emails and the trial testimony of Harris. However, even on a preponderance of the evidence standard, this Court cannot hold that MDC met its burden of establishing that there was an agreement to commit fraud and/or an agreement between Harris and Cooper as to the intended outcome or result, that is, to defraud thousands of dollars from the Doyles without any return on their investment. In fact, in one of his emails to Cooper, Harris asks that Mark Doyle get a $300,000 return for his initial investment of $30,000. See Plaintiff's Exhibit 3 at Doyle 0023-0024. And while no negative inference can be drawn from Cooper's failure to appear as a witness at trial because all parties had equal access to her as a witness, the Court notes that Cooper's testimony would have been beneficial in determining whether Harris was assisting Cooper in her fraudulent scheme to defraud investors. MDC simply has not met its burden of proving a civil conspiracy.[7]

Based on the foregoing analysis, this Court enters judgment in favor of MDC and against Defendants in the amount of $33,000. A judgment shall issue herewith and the Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

**THUS DONE AND SIGNED**, in Shreveport, Louisiana this 25th day of June, 2021.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[7] In their Proposed Findings of Fact and Conclusions of Law submitted to the Court and in their post-trial brief (Record Document 150), Harris and FSA sought attorney's fees under Rule 54(d) and 28 U.S.C. § 1927. At this stage, the Court believes any such request under Rule 54(d) to be premature and the appropriate motion shall be filed. The undersigned does not believe the facts of this case warrant the award of attorney's fees under Section 1927.